**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

EDWIN H. YEO, III,  and YEO FARMS, L.L.C.    :

                      :

                Plaintiff,       :

        -against-               :

                      :

                      :

KASOWITZ, BENSON, TORRES &       :
FRIEDMAN, LLP and AARON MARKS, Esq.   :

                      :

            Defendants.      :

------------------------------------------------------------------X

Case No. _____

**VERIFIED COMPLAINT**

JURY TRIAL DEMANDED

PLAINTIFFS, by their undersigned attorney, Andrew Lavoott Bluestone, respectfully allege as follows:

## INTRODUCTION

1.      This is an action for legal malpractice and breach of fiduciary duty arising under the laws of the State of New York.

## SUBJECT MATTER JURISDICTION

2.      The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(a)(1) and 1367.  The amount in controversy exceeds $ 75,000.

3.      Venue is proper in this Court under 28 U.S.C. § 1391(a).

## THE PARTIES

4.      Plaintiff, EDWIN H. YEO, III ("Yeo" or "Plaintiff") is a natural person and is domiciled in and a citizen of the State of Ohio.

5.      Plaintiff YEO FARMS, LLC. ("Yeo Farms") is a limited liability company formed under the laws of Ohio with a principal place of business in Ohio.

6.      Plaintiff Yeo is a member of Yeo Farms, LLC.

7.     Upon information and belief, Defendant Kasowitz, Benson, Torres & Friedman, LLP ("Kasowitz")  is a New York limited liability partnership engaged in the practice of law, with its principal office located within the Southern District of New York in New York County at 1633 Broadway, New York, New York.

8.     Upon information and belief, Defendant Aaron Marks, Esq. ("Marks") is an attorney duly admitted to practice law within the State of New York and is a principal attorney at or partner of Kasowitz.

7.     There is complete diversity of citizenship between Plaintiffs and Defendants.

## NATURE OF THE ACTION

9.     This is an action for legal malpractice and breach of Defendants' fiduciary duty of undivided loyalty to plaintiffs, all based upon the negligent handling of the matter of *Frederick B. Whittemore v. Edwin H. Yeo III, Endurance Capital Management Company, L.P., Endurance Management Company, LLC, and Yeo Farms, LLC.,* venued in Supreme Court, New York County under Index No. 600742/2010 (the "New York court action").

9.     Kasowitz and Marks represented Plaintiffs in that litigation.

10.     In the late 1990's, Plaintiff Yeo and Frederick B. Whittemore ("Whittemore"), former colleagues at Morgan Stanley, created a private equity fund that would identify small to mid-size banks that could be sold to larger banks.

11.     An undocumented partnership was formed and called Van Buren Management Company ("Van Buren").

12.     The partnership was successful in obtaining a sizeable investment commitment of $125 million from the Ontario Teachers' Pension Fund ("Ontario").

13.     In or around 2001, Van Buren became Endurance Capital Management Company L.P. ("Endurance").

14.     The arrangement for Endurance was for Yeo to do the work and for Whittemore to provide the funding for the operation.

15.     The funding consisted of investments made by Whittemore and paid by periodic checks.

16.     There were other "money" partners at Endurance; however, Whittemore accounted for 80% of Endurance's working capital.

17.     Funding was provided by Whittemore on a weekly basis and Yeo was often required to pick up the weekly check from Whittemore at the Whittemore office at Morgan Stanley.

18.     Whittemore had sole discretion to determine the weekly funding amount which was used to pay all of Endurance's operating expenses, including salaries of Endurance's employees, as well as rent and utilities for the New York office space.

19.     It was agreed between Yeo and Whittemore that any residual amount from these weekly checks would be Yeo's compensation. Whittemore was aware of and approved of this payment method.

20.     For tax reasons, Endurance was structured to allow Yeo to take this residual compensation in the form of loans from Endurance. These loans were to be repaid from Yeo's share of the potential future profits that Endurance would earn on its investments.

21.     This structure benefited Whittemore from a tax perspective.

22.     As further compensation, Whittemore and Yeo determined that Yeo should receive a bonus. Rather than paying the bonus in cash, Whittemore obtained a letter of

credit based on Whittemore's stock holdings, which Yeo could then use to obtain a loan backed by the letter of credit.

23.     Whittemore gave the letter of credit to Yeo, who used it to obtain a $ 1.175 million loan from Northern Trust Company.  Northern Trust later drew down on that letter of credit when the loan was not repaid.

24.     Endurance's fee was 20% of the profits earned on its investments.

25.     Yeo and Whittemore verbally agreed that Whittemore would receive 40% of Endurance's fee.  However, Whittemore refused to sign a partnership agreement that was presented to him which would have memorialized this agreement in writing.

26.     During this period of time Endurance invested in nine different banks.  The investments performed well, but the profits were de minimus.  No distributions were made to the stakeholders of Endurance.

27.     Eventually, further investment in small banks was curtailed by Mr. Yeo who correctly predicted a downturn in the market.  Endurance and Ontario ceased doing business.

28.     A second Endurance fund, known as Endurance II, was formed in 2007.  Market events affected this fund.

29.     Negotiations for the purchase of Endurance by Morgan Stanley took place, but ultimately failed, mostly for market event reasons.

30.     Even though Endurance II received $ 78 million in investment commitments, Whittemore unexpectedly ended his weekly contributions to Endurance in or around April 2009.  Whittemore provided no more checks and no more funding after that time.

31.     Yeo attempted to keep the Endurance II fund going, but without Whittemore's weekly infusion of capital, Endurance II was faced with liquidity challenges, culminating in, among other things, a lawsuit filed in September 2009 against Endurance by Endurance's former accountants, Lever Point Management, LLC ("Lever Point"), over unpaid invoices for accounting services.  Kasowitz defended Endurance in the litigation against Lever Point.

32.     Finally, Endurance II was forced to cease operations when its investors reneged on their investment commitments in or around October, 2009.  Unsuccessful litigation against those reneging investors ensued.

33.     On March 23, 2010, Whittemore brought the New York court action against Yeo, Endurance Capital Management Company L.P., Endurance Management Company LLC, and Yeo Farms seeking to (a) protect or recover the capital contributions he made, and to (b) recover $ 1,175,000 in connection with the letter of credit guaranteeing Yeo and Yeo Farms' loan obligation to Northern Trust Company.

34.     Whittemore alleged causes of action for breach of contract, breach of fiduciary duty, accounting, fraud, and conversion against Endurance and an unjust enrichment claim against Yeo Farms.

35.     Whittemore claimed both that he was a limited partner in Endurance and that it was an undocumented partnership begun in 2002 between Yeo and him.  He further alleged that Yeo was the managing partner of Endurance Management Company, LLC, which was the general partner of Endurance Capital Management Company L.P. and that ultimately all of the Endurance entities were controlled and managed exclusively by Yeo.

36.     A summons and complaint in the New York court action was served on or about March 30, 2010.

37      The summons and complaint were purportedly served via personal service upon a person of apparently suitable age and discretion under New York law.

38.     The summons and complaint was served upon Enos Yoder at Yeo Farms in Lowellville, OH.

39.     As of that date Yeo already had an existing attorney-client relationship with Defendants Kasowitz and Marks in connection with the aforementioned lawsuit against Lever Point.

40.     Yeo timely informed Marks of the service of the summons and complaint and requested that Kasowitz undertake the defense of the action.

41.     Marks (on behalf of Kasowitz) agreed to defend Yeo upon receipt of a retainer.

42.     Yeo was travelling during the months of March and April, 2010.  His phone records demonstrated that he was in Ohio during the period April 20-22, 2010.  These phone records demonstrate one telephone call from Yeo to Kasowitz on April 22, 2010.

43.     On April 23, 2010 Yeo made three calls to Kasowitz.

44.     On April 23, 2010 defendant Marks called William Holm, Esq., the attorney for Whittemore to speak about the complaint.

45.     The Kasowitz law firm made one telephone call to Yeo on April 23, 2010.

46.     The Marks and Holm telephone call on April 23, 2010 demonstrates that Marks knew of the summons and complaint as of that date while there was time to answer the complaint.

47.    Nevertheless, neither Marks nor Kasowitz answered the complaint within the applicable time limits.

48.    No further pleadings were exchanged.

49.    In the fall of 2010, Yeo and Marks met in person at Kasowitz's offices, and Plaintiff was told by Marks "not to worry" about the complaint and that everything would be "taken care of."

50.    Even though the firm was retained by Yeo and they accepted the retainer to represent him, it failed to answer the complaint, inquire into the complaint, seek an extension, advise the client or take action between April 23, 2010 and September 29, 2010.

51.    On September 29, 2010, some 5 months after the summons and complaint was served, a motion for a default judgment was filed by Holm on behalf of Whittemore.

52.    The case was assigned to Justice Richard Braun, J.S.C.

53.    Defendants Kasowitz and Marks prepared opposition papers to the motion for default for Yeo, and in addition prepared an affidavit for Yeo dated October 26, 2010.

54.    Troublingly, the affidavit contained a massive number of errors or false statements, and it further contained statements that Marks knew to be untrue.

55.    Among other assertions, the affidavit falsely claimed that Yeo was formerly Chairman of the Board of Governors of the Federal Reserve, that Endurance was not represented by counsel, and that Kasowitz knew nothing of the lawsuit until the motion for default was filed.  The affidavit also claimed that, notwithstanding the discussions between Yeo and Marks and between Marks and Holm related to the Complaint in April 2010, Yeo did not discover the existence of the Complaint until June 2010.

606622825.1

56.     Each of those assertions, which were demonstrably false, tended to cast doubt on Plaintiff's veracity.

57.     Ultimately, Whittemore was granted a default as to liability only, and a damages inquest was set to determine damages.

58.     A key factor in the court's decision to grant the default was the Holm affirmation which stated that Defendant Marks called Holm on April 23, 2010 to discuss the complaint.

59.     This fact severely undercut the assertion (set forth in the affidavit) that Yeo was not aware of the complaint until June of 2010.

60.     This fact forcefully demonstrated law office failure to answer the complaint.

61.     Defendant Marks never contradicted Holm's assertion. To the contrary, Marks eventually admitted that Yeo discussed the complaint with him and that he then called Holm to discuss the complaint.

62.     Between April 22, 2010 and September 29, 2010, there was extensive contact between Yeo and Defendants. More than 70 calls were made between them during that period of time, mostly in August and September.

63.     Upon entry of the default order, an order of reference was entered and an inquest was held before Special Referee Ira Gammerman.

64.     At the inquest the Kasowitz firm, (as Yeo's attorneys) were permitted to make arguments concerning damages, but they could not offer defenses. Nevertheless, there were significant arguments that still could be made relating to damages.

65.     No sufficient arguments were made that there was no transfer of money based on fraud.

606622825.1

66.     No sufficient arguments were made that the losses were not the result of the "action" or "inaction" of Yeo, but rather arose because of market forces, the abrupt failure of Whittemore to continue to make expense payments, or some other cause.

67.     Defendants failed to obtain or subpoena tax returns of Whittemore, which would have allowed for set-offs as well as for cross-examination on actual damages.

68.     Judgment was granted against Yeo in the amount of $ 11,900,345.

69.     The judgment was unsuccessfully appealed to the Appellate Division, First Department.  A motion for leave to appeal to the Court of Appeals was similarly unsuccessful.

70.     The Appellate Division agreed with Justice Braun that Plaintiffs did not offer a reasonable excuse for failing to answer the complaint.

## FIRST CAUSE OF ACTION
## <u>MALPRACTICE</u>

71.     The handling of the complaint, the failure to seek an extension, obtain an extension, prepare an answer, file an answer, move to dismiss or otherwise save a client from the default in answering the complaint was a departure from good and accepted practice evidencing a failure by Defendants to exercise the degree of care commonly employed by an ordinary attorney under similar circumstances with respect to its client, the Plaintiffs.

72.     Defendants failed to exercise the ordinary, reasonable skills and knowledge commonly possessed by a member of the legal profession, especially attorneys who practice in commercial litigation settings.

73.     This failure to exercise the ordinary, reasonable skills and knowledge commonly possessed by a member of the legal profession proximately caused damage to Plaintiffs.

74.     The damage consisted of the grant of a default judgment which was entered against Plaintiffs along with all attorney fees paid to defend the New York court action.

75.     This failure to exercise due care was the proximate cause of financial injury to Plaintiffs defined by the default judgment and expenses associated with the litigation.

76.     But for these failures, Plaintiffs would not have suffered entry of the judgment, or additional legal fees payable to their own attorneys, legal fees payable to opposing attorneys, additional costs and other consequential damages, all required to avoid, minimize or reduce damage caused by Defendants' negligence.

77.     Further failures took place in the preparation of papers responsive to the motion seeking a default judgment.

78.     The papers were wildly inaccurate, and gave the appearance of falsehoods.

79.     Besides the wildly inaccurate assertions, the papers were simply wrong on the dates and the acts of the Kasowitz law firm.

80.     The law firm was aware as early as April 23, 2010 that a complaint had been served upon Yeo.

81.     Nevertheless, in an effort to shift blame away from the law firm, it prepared a false affidavit for Yeo and did so in an especially bungling manner.

82.     Apparently, Mr. Marks forgot that he had discussed the complaint with Mr. Holm on April 23, 2010.  Mr. Holm did not forget.

83.     Marks then concocted a story which failed to take the conversation into account.

84.     Marks attempted to shift blame from himself and the law firm over to Yeo.  The law firm's refusal to accept blame and explain its law office failure succeeded in shifting the blame to Yeo.

85.    Had Marks admitted law office failure, it is most likely that the claim of law office failure would have been sufficient to avoid an inquest.  It is certain that Yeo would not have been held personally liable.  There existed meritorious defenses.

86.    However, Marks chose to write a false affidavit, allowed a faulty affidavit to be prepared for Yeo, advised Yeo to sign it, all of which gave the court little choice but to grant the default.

87.    By reason of the foregoing, Plaintiffs are entitled to judgment against Defendants in an amount which exceeds the amount of the default judgment against Plaintiff along with consequential damages, interest and attorney fees.

## SECOND CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY

88.    Plaintiffs restate the allegations contained in the preceding paragraphs with the same force and effect as if separately set forth and numbered herein.

89.    By virtue of the attorney-client relationship, Defendants owed Plaintiffs a fiduciary duty to deal fairly, honestly and with undivided loyalty and acknowledge law office errors and failures in their communications with the Court and in their motion practice.

90.    Defendants were under a duty to Plaintiffs to act for them, to act properly, acknowledge law firm errors, refrain from camouflaging their errors or in attempting to shift their errors to Plaintiff, or to blame plaintiff for law office errors in the representation of Plaintiffs.

91.     Defendants were similarly under an obligation to admit the true facts, to advise the Court that they had knowledge of the complaint, and that by reason of law office failure they had failed to answer the complaint within the time period.

92.     Instead, Defendants, in a conflict of interest, successfully shifted the blame to Yeo, and shifted the actual law office failure problem away from themselves.

93.     This was a fraudulent and wrongful act which breached their fiduciary duty not to engage in deceit, or to attempt to blame Yeo for the law firm's mistakes.

94.     Defendants breached their fiduciary duty to Plaintiffs by their evasive, untruthful motion practice, in their failure to acknowledge law office failures or errors, in their failure to admit that the law office was aware that a complaint had been served upon Plaintiffs, and in their refusal to take responsibility for the law office failure in answering the complaint.

95.     Significantly, the law office received an initial retainer payment of $ 25,000 from Yeo, but never asked for any further payment.

96.     Defendants represented Yeo in Supreme Court, in the Appellate Division and before the Court of Appeals.  Based upon history and the traditional scope of billing by a law firm of Defendant's stature, one might expect billings of more—indeed a great deal more—than $500,000 for representation in Supreme Court motion practice, an appeal to the Appellate Division, and thence to the New York Court of Appeals.

97.     Beyond the attorney fees that would have been billed on an hourly rate, there are significant expenses of appellate printing and court costs.  Printing expenses alone could top $20,000.

98.     Indicative of Defendants' state of mind and strongly implying their understanding that law office failure was the cause of the default is the unassailable fact that Defendants did not bill Plaintiffs for any of the work or even for out-of-pocket expenses.

99.     This deviation from typical practice is circumstantial evidence of the culpability of, and acknowledgement by, Defendants of their breach of fiduciary duty.

100.    Defendants' breach of fiduciary duty was a substantial factor in damages to Plaintiffs, which led to a negative financial outcome for Plaintiffs.

101.    Damages claimed in this cause of action are in the nature of return of attorney fees, disgorgement of preciously paid fees, reimbursement for other attorney fees along with interest and attorney fees to try to fix the problem.

102.    Damages claimed in this cause of action arise from different conduct, and are based upon different analysis than that of the legal malpractice cause of action.

103.    By reason of the foregoing, Plaintiffs are entitled to judgment against Defendants in an amount to be proven at trial as more fully set forth above.

WHEREFORE, Plaintiffs demand judgment against Defendants for an amount to be determined at trial, on each of the first and second causes of action, punitive damages, together with the costs and disbursements of this action, and for such other and further relief as this Court deems just and proper.

Dated: New York, New York
       August 6, 2015

Andrew Lavoott Bluestone
233 Broadway, Suite 2702
New York, NY 10279
(212) 791-5600

606622825.1

State of New York        )
                                               )      ss:
County of New York       )

EDWIN H. YEO, III, being duly sworn, deposes and says that deponent is a member of Plaintiff

Yeo Farms LLC,  a corporation described as Plaintiff in the within action, that deponent has read

the foregoing Complaint and knows the contents thereof; that the same is true to deponent's own

knowledge, except as to the matters therein stated to be alleged upon information and belief, and

as to those matters deponent believes them to be true.  This verification is made by deponent

because Plaintiff is a limited liability company under Ohio law and Deponent is a member

thereof.

_____
Edwin H. Yeo, III, as Member and Individually


Sworn to before me this
14th day of August, 2015

_____
Notary Public


Maureen Elizabeth Cloonan
Notary Public, State of New York
No. 01CL6289028, Qualified in Queens County
Certificate filed in New York County
Commission Expires 9/16/17